UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEBRA A. FARMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-0379-DFH-JMS |
| | ) | |
| SENIOR HOME COMPANIONS | ) | |
| OF INDIANA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTION FOR SUMMARY JUDGMENT

Defendant Senior Home Companions of Indiana, Inc. ("SHC") is a referral agency that arranges non-medical, in-home caregiving services for the elderly in Indianapolis. Plaintiff Debra Farmer works as a caregiver under a contractual referral arrangement with SHC. Farmer has alleged claims of discrimination and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981. Farmer, an African-American, claims that SHC has discriminated against her by failing to promote her on par with similarly situated Caucasian caregivers and by reassigning her hours to Caucasian caregivers without cause. Farmer further claims that when she complained about this discrimination, SHC retaliated against her by reducing her hours. Defendant SHC has moved for summary judgment on all claims.

The case is remarkable for the absence of any actual evidence of adverse action or any sort of harm to plaintiff.  One client asked that Farmer be replaced, and she was, but there is no evidence that Farmer's race had anything to do with that decision.  After that replacement, Farmer worked even more hours for SHC than she had before.  In short, the undisputed facts offer no evidence of race discrimination, retaliation, or even harm to plaintiff.  Defendant's motion is granted.

## Standard of Review

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To prevail, the moving party must show that there is no genuine issue of material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on an issue at trial and the motion challenges that issue, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e)(2); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).

A factual issue is material if resolving the issue might change the suit's outcome under the governing law.  See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented.  See *id*.  In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence; the court must view all the evidence in the record in the light reasonably most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 249-50.

*Facts for Summary Judgment*

The following statement of facts is not necessarily objectively true in all respects, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving party, plaintiff Debra Farmer.  See *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

SHC is a referral agency that arranges non-medical caregiving services for the elderly.  Clients seeking home care contract with SHC, which refers a caregiver from its roster.  The client is free to request a different caregiver before or after services have begun.  Each client agrees to a total rate for the services.  The client

allocates this rate between SHC and the caregiver according to the contract, paying each with separate checks.

SHC caregivers are independent contractors who receive no guarantee as to schedule or minimum hours.  They may set certain specifications for the kinds of referrals they prefer (*e.g.*, time of day, geography, etc.) and are under no obligation to accept the offered referrals.

Caregivers earn $11 per hour initially and may receive a one-time $1 per hour raise.  Def. Resp. to Interrog. 8-9.  No caregiver earns more than $12 per hour.  Miller Dep. Ex. 9 at 1-3; Farmer Dep. 45.  Though the clients pay the caregivers directly, SHC makes the determination regarding the rate paid to the caregiver.  Miller Dep. 44; Farmer Dep. 125-26.  When a caregiver earns a raise to $12 per hour, the client pays the same total amount but adjusts the allocation between the caregiver and SHC.  Farmer Dep. Ex. 15 at 1.  SHC considers various factors when deciding a caregiver's rate, including skills, training, education, flexibility, availability, punctuality, attitude, cooperation with SHC and other caregivers, comments from clients, and "intuition" regarding client needs.  Def. Resp. to Interrog. 8-9; Scott. Dep. 23.  Of the 151 caregivers on SHC's referral roster, 74 earn $11 per hour and 77 earn $12 per hour.  Def. Supp. Resp. to Interrog. 1-4; Miller Dep. Ex. 9 at 1-3.

Approximately 54 percent of the caregivers on SHC's referral roster (81 of 151) are African-American.  Def. Supp. Resp. to Interrog. 1-4.  Of those paid $12 per hour, 53 percent are African-American (39 of 74).  *Id.*  Caucasian caregivers move to $12 per hour after an average of 1,121 days with SHC; African-Americans achieve this raise after an average of 927 days.  Miller Dep. Ex. 9 at 1-3.  Farmer has not identified any racially discriminatory statements or other direct evidence of racial bias attributable to SHC.  See Farmer Dep. 106.

SHC circulated a "Caregiver Procedures" form to all its caregivers in May 2008, which Farmer received.  This form instructed caregivers to avoid sharing personal beliefs or practices with clients and advised that if the client asked about such matters, the caregiver should change the subject.  Farmer Dep. Ex. 27 at 1-2.

Plaintiff Debra Farmer is a caregiver on SHC's referral roster.  Her relationship with SHC began in October 2005 when she first signed a referral arrangement contract.  The contract contained a non-compete agreement.  In July 2007, SHC sent a letter to all caregivers notifying them that it had revised its referral agreement and that all caregivers would have to sign the new form.  This new form contained an updated non-compete agreement.  All caregivers were required to sign the new agreement, and neither Farmer nor SHC has identified a caregiver who failed to do so.  Farmer Dep. 50-54.

Farmer requested that her referrals conform to several restrictions as to type, timing, and location.  Farmer Dep. 92-93; Farmer Dep. Ex. 26 at 1-2. Throughout her relationship with SHC, Farmer has been employed full time by a public school system and thus has not been able to accept referrals on weekdays between 8:30 a.m. and 2:45 p.m.  Farmer Dep. 12-15.  She spent the summer of 2006 living with her mother in Pennsylvania and could not accept referrals during that time.  Farmer Dep. 42, 79-80.  After her mother moved to Indianapolis, Farmer began taking her to church and requested that she not receive referrals requiring a Sunday morning commitment.  Farmer Dep. 119.  Farmer further limited her availability to exclude referrals in nursing homes and those that required her to travel to the south side of Indianapolis.  Farmer Dep. 93-94.

In December 2007, Farmer spoke with SHC business manager Anne Miller and requested an increase in her pay from $11 to $12 per hour.  She told Miller that she "didn't think that it was fair that [Miller] was giving raises to caregivers who were white and not caregivers who were black."  Farmer Dep. 45.  More specifically, she identified a Caucasian caregiver, Jennifer Gibson, who received a $1 rate increase after just four or five months.  Miller Dep. 49-50.  Miller told Farmer that SHC would take her request into consideration and get back to her. *Id.*  Within two weeks of this request, Farmer received a raise to $12 per hour, the same raise received by Gibson.  Farmer Dep. 60.

Farmer accepted and provided care for four SHC referrals.  For three of those referrals, Farmer earned a rate equal to or higher than that of the other caregivers also assigned to that client; during the fourth, she was awarded the $1 raise, at which point no caregiver on that or any other referral earned a higher rate than Farmer did.  Def. Ans. to 2d Interrog. No. 20.

In early 2006, one of Farmer's referrals involved providing evening and overnight care for a client identified as Mrs. DeVoe.  DeVoe's daughter, a Ms. Stafford, helped handle her mother's affairs and arranged for her care with SHC. Farmer initially worked four nights per week at DeVoe's home, but her duties expanded to include five and then seven nights per week.  Farmer Dep. 31-32; Farmer Dep. Ex. 9.

In early May 2006, Stafford raised with SHC two concerns she had regarding Farmer.  The first concern was the appearance that Farmer had moved into DeVoe's house.  Miller Dep. 58.  Farmer's car was full of personal belongings, and she was using DeVoe's home to do her laundry and to store her clothes, toiletries, and groceries.  Miller Dep. 58; Scott Dep. 45; Farmer Dep. 71; Farmer Dep. Ex. 35.  Around the same time, Farmer opened a post office box and gave SHC that box as her new address.  Farmer Dep. Ex. 31 at 9.  Farmer stated that she made this change because she "was moving at the time probably."  Farmer Dep. 40.  Stafford's second concern was that Farmer was discussing her personal beliefs with DeVoe.  Specifically, Farmer's car displayed a sign that called for the

banning of microwaves, and she had told DeVoe about her belief that the government used microwaves as a weapon.  Farmer Dep. 67-68; Miller Dep. 59.

Stafford addressed these concerns with Farmer on May 6, 2006.  She informed Farmer that she had spoken with Miller and that Farmer would be replaced as DeVoe's caregiver.  Farmer Dep. 69-70; Farmer Dep. Exs. 10, 35.  The replacements for DeVoe's caregiving were all also African-American.  Miller Dep. 63-68; Miller Dep. Ex. 7 at 1.

After her removal from the DeVoe assignment, Farmer spent the summer of 2006 living with her mother in Pennsylvania.  During this time she was unavailable for assignments and received no referrals from SHC.  Upon her return to Indianapolis in August 2006, Farmer began receiving referral calls from SHC once again.  Farmer Dep. 40-42, 79-80.

Farmer's annual hours and total compensation have increased throughout her time with SHC:

| Year | Total Hours | Total Pay |
|------|------------|-----------|
| 2006 | 1,182.5 | $18,589.23 |
| 2007 | 1,824.5 | $22,950.63 |
| 2008 | 1,937.5 | $24,432.00 |

Farmer Dep. Ex. 13 at 2-8.  Farmer achieved her highest totals for both hours and earnings in 2008, despite turning down seven referrals and resigning one regular

assignment.  Miller Aff. ¶¶ 6-14; Farmer Dep. 97, 103-05.  Additional facts are noted below as needed, keeping in mind the summary judgment standard.

*Discussion*

I.  *Discrimination*

Section 1981 of Title 42 of the United States Code was first enacted as part of the post-Civil War Civil Rights Act of 1866.  As amended, it now provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b).  Title VII of the Civil Rights Act of 1964 prohibits race discrimination by most employers in the United States, but it does not apply to treatment of independent contractors like the SHC caregivers.  Independent contractors may seek relief for race discrimination under section 1981.  See *Taylor v. ADS, Inc.*, 327 F.3d 579, 581-82 (7th Cir. 2003); *Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176-77 (7th Cir. 1996).  A section 1981 race discrimination claim is governed by the same analysis as a Title VII race discrimination claim, *Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021,

1028 (7th Cir. 2004), and can be proven by direct or indirect evidence, *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849 (7th Cir. 2008).

Direct evidence can take the form of an employer's admission of discrimination or can consist of "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009), quoting *Phelan v. Cook County*, 463 F.3d 773, 779-80 (7th Cir. 2006).   Farmer advances no direct evidence argument.  Her brief discusses only the elements of the indirect method of proof.

To avoid summary judgment by using the indirect method, Farmer must come forward with evidence supporting the elements of a *prima facie* case:  (1) she is a member of a protected class, (2) she was meeting the other party's legitimate expectations, (3) she suffered an adverse action, and (4) other similarly situated parties who were not members of the same class were treated more favorably.  See *Andonissamy*, 547 F.3d at 849-50.  If Farmer could support her *prima facie* case with evidence, the burden of production would shift to SHC to articulate a legitimate, non-discriminatory reason for its decision.   *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007).  If the court's analysis were to reach that stage, Farmer could withstand summary judgment only by offering evidence that SHC's proffered reason was actually false, which would allow a jury to infer from the pretext that the true reason was unlawful discrimination.  *Id.*

SHC argues that summary judgment is appropriate because Farmer has failed to offer evidence that she met SHC's legitimate performance expectations, that she suffered an adverse action, or that other similarly situated caregivers not in the protected class were treated more favorably.  There is at least a reasonable dispute over whether Farmer met SHC's legitimate expectations with respect to the alleged move into a client's home and the discussion of a controversial topic.  After all, the undisputed evidence shows that SHC continued to offer Farmer's services and that she worked more after those events than she had before.  The court need not definitively resolve the issue because Farmer has produced no evidence supporting the last two elements of her *prima facie* case:  that SHC took an adverse action against her, and that similarly situated Caucasian caregivers were treated more favorably.  Because Farmer has failed to produce evidence supporting a *prima facie* case of racial discrimination, the court does not address pretext.

Farmer claims that she has suffered two adverse actions:  that SHC took assignments away from her and reassigned them to white caregivers, and that SHC failed to award her a raise until after she had worked two years with SHC, while similarly situated Caucasian caregivers received raises after much less time.[1]  If supported with competent evidence, a reassignment or a failure or delay

---

[1]Farmer's original complaint included three additional claims:  (1) that she deserved a larger raise than the one she received ($2 per hour instead of $1), (2) that SHC used her as a substitute instead of providing her with steady, single-client referrals, and (3) that SHC forced her to sign a non-compete agreement
(continued...)

in awarding a raise can be sufficient to comprise an adverse action that would satisfy the third prong of a *prima facie* case under section 1981.  Farmer has no evidence to support either theory.  Farmer also cannot satisfy the fourth prong because she has failed to offer evidence that similarly situated Caucasian caregivers were treated more favorably with regard to raises or assignments.

> A.      *Failure to Award Raises*

Farmer claims that SHC failed to award her a raise until two years after she started with SHC, despite promises from SHC that she would receive the raise after one year.  The Seventh Circuit has recognized that the denial of a raise can constitute an adverse action.  *Hunt v. City of Markham, Illinois*, 219 F.3d 649, 654 (7th Cir. 2000) (finding denial of raise to be adverse action under Title VII); see also *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009) ("denial of a promotion is a materially adverse action" under section 1981); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) (acknowledging that awarding a lower raise relative to other employees could constitute adverse action under section 1981 but finding that plaintiff failed to produce evidence that defendant's reasons for the smaller raise were pretextual).  Such a claim, however, must be evaluated in the context of the other party's regular practices and its treatment

---

[1](...continued)
while not requiring Caucasian caregivers to do so.  SHC's brief in support squarely attacked these issues and provided undisputed evidence to defeat each claim. Farmer failed to address any of these claims in her response, and they are deemed waived.  See *Sanders v. Village of Dixmoor, Illinois*, 178 F.3d 869, 870 (7th Cir. 1999).

of other employees or contracting parties.  In cases like this one where a plaintiff alleges that she was denied a benefit, it is most useful to analyze prongs three and four together.  Farmer has failed to offer evidence that would allow a jury to find that similarly situated Caucasian caregivers were treated better with respect to the raise at issue.  Her *prima facie* case therefore lacks both the third and fourth prongs.

Farmer rests her argument regarding raises on one Caucasian caregiver, Jennifer Gibson, who she argues was similarly situated and was given a raise sooner than Farmer was.[2]  Employees are similarly situated if they are directly comparable in all material respects.  *Crawford v. Indiana Harbor Belt Railroad Co.*, 461 F.3d 844, 846 (7th Cir. 2006); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).  Two considerations are particularly significant to this determination:  whether the employees have comparable experience, education, and other qualifications, *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 741 (7th Cir. 2006), and whether they have a "comparable set of failings" with regard to their job performance, *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008).  These considerations also apply under section 1981.

---

[2]Farmer also refers to Patricia Lines, a Caucasian caregiver who Farmer claims was awarded a raise sooner than Farmer was.  However, at the time this suit was filed, Lines earned only $11 per hour, $1 per hour *less* than Farmer.  Although Lines was technically granted a pay increase around June 2004, this was an increase from $10 to $11 per hour.  Because all SHC caregivers now earn at least $11 per hour, this increase appears to represent a company-wide increase in base pay rather than a merit-based raise awarded specifically to Lines.  At no time did Lines ever earn a higher hourly rate than Farmer.

The undisputed evidence shows significant material differences between Gibson and Farmer with regard to their education, qualifications, and job performance.  At the time of her raise, Gibson held a nursing home administrator license, had earned a four-year college degree, and was attending courses to obtain her registered nurse's degree, which she has since earned.  Miller Aff. ¶¶ 16-17.  Farmer can claim no comparable education.  Though Farmer touts her experience as a substitute teacher and her work with the blind and mentally challenged, she had only one year of home caregiving experience prior to starting at SHC.[3]  Farmer Dep. 15-16, 25.  Gibson has consistently received positive reviews from clients and has never been dismissed by a client for any reason. Miller Aff. ¶ 20.  Farmer, on the other hand, has had problems with at least two clients.  *Id*. ¶¶ 7, 13; Farmer Dep. 68-71, 97.  Gibson also has worked significantly more hours per week than Farmer and has placed no restrictions on her referrals. Miller Aff. ¶¶ 4,19.  These undisputed facts show that Gibson and Farmer had markedly distinct education, qualifications, and job performance, and thus were not similarly situated for the purposes of this prong.  See *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006) (affirming summary judgment for employer where plaintiff's comparators were not similarly situated because they had superior levels of experience and education); *Radue v. Kimberly-Clark Corp.*,

_____

[3]Farmer contends that these differences are irrelevant because prior work experience, social skills, and work ethic are the "real standards" by which SHC evaluates its caregivers.  She identifies no evidence to support this contention. Further, it is unclear how these standards favor her case, given the two personal conflicts she has encountered with clients, the significant limitations she has placed on referrals she will accept, and her refusals of many assignments.

219 F.3d 612, 618-19 (7th Cir. 2000) (affirming summary judgment for employer where plaintiff's comparators were not similarly situated because of their superior job performance).

The undisputed evidence of SHC's hiring practices shows that Farmer was actually treated more favorably than most Caucasian caregivers. Farmer received a raise to $12 per hour after approximately 820 days with SHC; on average, Caucasian caregivers receive this raise after 1,121 days. Farmer has presented no evidence that she was more deserving of a raise than the average SHC caregiver. Farmer has failed to establish that her rate of pay showed less favorable treatment than that received by similarly situated Caucasian caregivers.

B.    *Reduction of Hours*

Farmer contends that SHC reduced her referral hours and assigned those hours to Caucasian caregivers.  A reduction of hours that significantly affects one's income can constitute an adverse action.  See, *e.g.*, *O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004) (reduction of hours that affects income constitutes adverse action under Title VII).  However, since all of the evidence before the court shows that Farmer's hours were not reduced, Farmer has failed to establish that any such adverse action occurred.

Farmer's response brief presents no evidence that her hours were reduced. In fact, the undisputed evidence shows that her hours and compensation have increased throughout her time with SHC.  In 2008, Farmer worked 1,937.5 hours, her highest annual total at SHC.  That translates to an average of more than 37 hours per week, despite the restrictions that Farmer has placed on her availability and the numerous referrals she has rejected.

Farmer points to her dismissal from the DeVoe assignment to establish that her hours were reduced, but her hours have steadily increased since this dismissal.  In theory, Farmer might be able to treat a reassignment as an adverse action.  Under certain narrow circumstances, reassignment with significantly different responsibility can constitute an adverse action.  *Tart v. Illinois Power Co.*, 366 F.3d 462, 474-75 (7th Cir. 2004); *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.

1994).   However, in this case, Farmer has failed to provide evidence that her reassignment impaired her compensation, benefits, or career prospects.   See *Nichols v. Southern Illinois Univ.*, 510 F.3d 772, 780-81 (7th Cir. 2007) (no adverse action where plaintiffs were unable to show that undesirable assignment affected their salaries, benefits, or opportunities for future advancement); *O'Neal v. City of Chicago*, 392 F.3d 909, 912-13 (7th Cir. 2004) (employee's transfer arguably offered fewer overtime opportunities, less supervisory responsibilities, and less flexible schedule but was not an adverse action because employee's complaints amounted to a "purely subjective preference for one position over another").   The undisputed evidence before the court reveals no effect on Farmer's benefits or opportunities for future advancement, but rather an *increase* in her hours and pay.    On this evidence, a reasonable jury could not find that Farmer's reassignment from DeVoe to other clients amounted to an adverse action.

Even if Farmer could establish that her dismissal from the DeVoe assignment constituted a materially adverse action, her *prima facie* case would still fail because she has failed to establish that any Caucasian caregivers were treated more favorably with respect to the assignment.   Farmer's argument on this fourth prong is limited to her unsupported contention that SHC acquiesced in its client's racial discrimination by consenting to Stafford's request that Farmer be removed from the assignment.   Farmer presents absolutely no evidence of a racial basis for the client's request that she be replaced.   All of the caregivers who replaced Farmer on the DeVoe assignment were also African-American.   Miller

Dep. 63-69; Miller Dep. Ex. 7 at 1.   Farmer has provided no evidence that Caucasian caregivers were treated more favorably with respect to this assignment, and accordingly her *prima facie* case fails.[4]

II.   *Retaliation*

Section 1981 prohibits parties to a contract from retaliating against one another for complaints of race discrimination.   See *CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1954-55 (2008); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Retaliation claims under section 1981 require the same analysis as those under Title VII.   *Stephens*, 569 F.3d at 786.  In her complaint, Farmer alleges that she engaged in a protected activity by complaining that SHC was giving raises to white caregivers and not black caregivers, and that SHC retaliated against her for doing so by reducing her referral hours, failing to grant a $2 per hour raise, and using Farmer as a less desirable substitute.   As discussed above, Farmer failed to argue both the substitute referrals and the $2 per hour raise in her brief in response, and she has waived these claims on summary judgment.   This leaves only the claim that SHC retaliated against Farmer by reducing her hours.   Though Farmer has offered evidence that she

_____

[4]To support her argument, Farmer points to two cases from other circuits holding that an employer can be liable for sexual harassment by acquiescing in a customers' offensive sexual conduct directed to the employee.  *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072-73 (10th Cir. 1998); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111-1112 (8th Cir. 1997).  Farmer has produced no evidence that SHC acquiesced in any customer's racial bias toward her.

engaged in protected activity, her retaliation claim fails for the same reasons her discrimination claim fails.

A claimant may establish retaliation via the direct evidence method or via the indirect, burden-shifting method. *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Farmer relies only on the indirect method, which requires a plaintiff to offer evidence of a *prima facie* case by showing that (1) she engaged in a statutorily protected activity, (2) she met the other party's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated caregivers who did not engage in a statutorily protected activity. *Id.* If Farmer can establish her *prima facie* case, the burden shifts to SHC to articulate evidence of a lawful reason for its action. *Id.* at 904. If the SHC can do so, the burden shifts back to Farmer to show that SHC's reason is pretextual. *Id.* Because Farmer has not established a *prima facie* case of retaliation, the court does not address pretext.

A claimant may establish that she engaged in protected activity by showing that she had a reasonable belief that she was challenging prohibited conduct. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997). A claimant need not explicitly mention race but must indicate that discrimination based on race is the reason for the communication. *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727-28 (7th Cir. 2003); *Flores v. Chicago Transit Auth.*, 2006 WL 2868904, at *7 (N.D. Ill. Oct. 4, 2006).

SHC argues that Farmer did not engage in a statutorily protected activity. This argument is unpersuasive.  SHC relies on *Flores v. Chicago Transit Authority*, 2006 WL 2868904 (N.D. Ill. Oct. 4, 2006), in which the court granted summary judgment on an employee's retaliation claim.  The employee had sent an email asking about the basis for his employer's scheduling decisions and asking whether that basis might be seniority, favoritism, communication, or "color."  The *Flores* court found that the inquiring tone and the inclusion of alternative bases made the email too "vague" and that the email's primary focus was a "personal" grievance and not opposition to a practice outlawed by Title VII.  *Id.* at *8. However, the court arrived at this conclusion only after examining the employer's formal policy for filing complaints, and finding that, "considering [that] process, a reasonable jury could not conclude his email constitute[d] protected expression." *Id.* at *8.  Before the court addressed the complaint policy, it acknowledged that "a reasonable jury could conclude that [the employee's] email effectively communicated his complaint because [it] made clear [the employee] was unhappy with his work shifts and suggested [the employer] considered 'color' in assigning work shifts."  *Id.* at *7.

As Farmer points out, SHC has not shown that it has a formal complaint process or that she should have taken alternative measures to express her complaint.  Farmer's statement to Miller that she "didn't think that it was fair that she was giving raises to caregivers who were white and not caregivers who were black" was neither "vague" nor merely "personal."  Farmer Dep. 44-45.  Viewing

the evidence in the light most favorable to Farmer, her complaint was an explicit challenge to a perceived pattern and practice of racial discrimination and was therefore activity protected from retaliation under section 1981.  See *id.* at *8 (applying Title VII).  SHC argues that Farmer's complaint was not about race but about money.  The subjects are not mutually exclusive.  Racial discrimination in monetary compensation lies at the heart of the bias targeted by both Title VII and section 1981.  Farmer's complaint was about a perceived pattern of racial discrimination by SHC in awarding raises.  The fact that no such discrimination occurred is irrelevant at this step so long as Farmer reasonably believed that such discrimination may have existed at the time she made the statement.  See *Dey v. Colt Constr. & Development Co.*, 28 F.3d 1446, 1457-58 (7th Cir. 1994).

Farmer has offered evidence to support the first prong of her *prima facie* case of retaliation, and as mentioned above, there is at least room for reasonable debate on the second prong, her ability to meet SHC's legitimate expectations. However, Farmer's case must fail because she has failed to meet her burden on the third and fourth prongs.  To satisfy those prongs, Farmer incorporates without modification the corresponding arguments from the reassignment portion of her discrimination claim.  For the same reasons discussed above, Farmer has failed to meet her burden on both of these prongs, offering no evidence to support her assertions that her reassignment away from the DeVoe referral constituted a materially adverse action or that any other caregivers were treated more favorably.

The undisputed facts show that Farmer has failed to establish her *prima facie* case, so SHC is also entitled to summary judgment on Farmer's retaliation claim.

*Conclusion*

SHC's motion for summary judgment is granted, and final judgment will be entered in favor of defendant SHC.

So ordered.

Date:  December 17, 2009

_____
DAVID F. HAMILTON, CIRCUIT JUDGE*
*Sitting by designation

Copies to:

John H. Haskin
HASKIN LAUTER & LARUE
jhaskin@hlllaw.com

Anne B. Hayes
BARNES & THORNBURG
ahayes@btlaw.com

John T.L. Koenig
BARNES & THORNBURG
jkoenig@btlaw.com

Ryan P. Sink
HASKIN LAUTER & LARUE
rsink@hlllaw.com